No. 27 October 12, 2023 413

IN THE SUPREME COURT OF THE
STATE OF OREGON

Matthew Daniel INGLE,
*Petitioner on Review,*

*v.*

Dolores MATTEUCCI,
Superintendent, Oregon State Hospital,
*Respondent on Review.*

(CC 18CV09971) (CA A170009) (SC S069222)

On review from the Court of Appeals.*

Argued and submitted September 30, 2022.

Lindsey Burrows, O'Connor Weber LLC., Portland, argued the cause and filed the briefs for petitioner on review.

Jordan R. Silk, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Flynn, Chief Justice, and Duncan, Garrett, DeHoog, and James, Justices, and Balmer and Walters, Senior Judges, Justices pro tempore.**

DUNCAN, J.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to that court for further proceedings.

Garrett, J., dissented and filed an opinion, in which Balmer, S.J., joined.

_____
* Appeal from Marion County Circuit Court, Lindsay Partridge, Judge. 315 Or App 416, 501 P3d 23 (2021).

** Nelson, J., resigned February 25, 2023, and did not participate in the decision of this case. Bushong and Masih, JJ., did not participate in the consideration or decision of this case.

**DUNCAN, J.**

This case concerns the statute of limitations for petitions for post-conviction relief, ORS 138.510(3). That statute includes a limitations period and an exception to that period. It provides that a petition "must be filed within two years" of the date the challenged conviction became final unless the ground for relief "could not reasonably have been raised" within those two years. The exception to the time limit is commonly known as the "escape clause." If a petitioner files their petition after the limitations period, the petitioner must establish that the escape clause applies. That is, the petitioner must establish that their ground for relief could not reasonably have been raised within two years of the date their conviction became final.

In the criminal case underlying this post-conviction case, petitioner waived his right to a jury trial and raised an insanity defense. The trial court found petitioner "guilty except for insanity" on all charges and placed him under the jurisdiction of the Psychiatric Security Review Board and committed him to the Oregon State Hospital.

More than eight years after his convictions became final, petitioner initiated this case by filing a *pro se* petition for post-conviction relief. Petitioner requested and received court-appointed counsel, who amended the petition. In the operative petition, petitioner acknowledged that the limitations period had run but asserted that the escape clause applied. Specifically, he asserted that the escape clause applied because, during the limitations period, he was disabled by "diagnosed schizophrenia" and the "forced consumption of extremely powerful psychotropic medications" and that those conditions "deprived him of the ability" to file a timely petition. The state[1] moved to dismiss the petition, asserting that petitioner's mental impairments were irrelevant to

---

[1] At the trial-court level, a person who brings a post-conviction case is the "petitioner" and the adverse party is the "defendant." ORS 138.570; *see, e.g.*, *Bogle v. State of Oregon*, 363 Or 455, 467-69, 423 P3d 715 (2018) (discussing the "petitioner" and the "defendant"). If the petitioner is in custody, the defendant is "the official charged with the confinement" of the petitioner. ORS 138.570. In this case, because petitioner is in custody at the Oregon State Hospital, the defendant is the superintendent of the hospital. For ease of reference, we refer to the superintendent as "the state." *See, e.g.*, *Richardson v. Belleque*, 362 Or 236, 238 n 1, 406 P3d 1074 (2017) (referring to the superintendent as "the state").

whether the escape clause applied. The post-conviction court agreed and granted the state's motion to dismiss.

Petitioner appealed, and, in a split decision, the Court of Appeals affirmed. *Ingle v. Matteucci*, 315 Or App 416, 501 P3d 23 (2021). We allowed review. On review, the parties dispute (1) whether a post-conviction court may consider a petitioner's mental impairments when determining whether the statute of limitations' escape clause applies and, if so, (2) whether petitioner's allegations were sufficient to raise a triable issue regarding the applicability of the escape clause.

For the reasons explained below, we hold that, in addition to other circumstances, the escape clause applies in circumstances where, during the limitations period, the petitioner had mental impairments that were so severe—both in degree and duration—that the petitioner was incapable of raising their ground for relief in a timely petition. We further hold that the petitioner's allegations in this case are sufficient to raise a triable issue regarding the applicability of the escape clause. Consequently, we conclude that the post-conviction court erred in granting the state's motion to dismiss on the pleadings, and we reverse and remand to the post-conviction court for further proceedings.

## I.  BACKGROUND

When this court reviews a post-conviction court's ruling on a motion to dismiss a petition, we assume that the allegations in the petition and its attachments are true, and we state the facts consistently with those allegations. *Chavez v. State of Oregon*, 364 Or 654, 656, 438 P3d 381 (2019); *Verduzco v. State of Oregon*, 357 Or 553, 555 n 1, 355 P3d 902 (2015).

A.  *Underlying Criminal Case*

In the underlying criminal case, the state charged petitioner with two counts of second-degree manslaughter and one count of driving under the influence of intoxicants. The charges were based on an incident in which petitioner was driving, ran a red light, and struck another vehicle, killing its occupants. After the crash, petitioner was transported to a hospital, where a blood test revealed the presence of cannabis, an anti-depressant medication, and two

anti-psychotic medications. When interviewed at the hospital, petitioner was hallucinating. He said that, during the crash, he "knew that aliens [were] there and he [thought] that something else [was] in control of the wheel of the car." He attributed the crash to "aliens" or "the Holy Spirit." The month before the incident, petitioner, who was 18 years old, had been self-admitted to three hospital psychiatric wards, diagnosed with schizophrenia, and prescribed the antipsychotic medications that he took on the day of the incident.

In the trial court, petitioner was represented by a defense lawyer, McCauley. On McCauley's recommendation, petitioner waived his right to a jury trial and proceeded to a stipulated facts trial, during which he raised an insanity defense pursuant to ORS 161.295. That statute provides that "[a] person is guilty except for insanity if, as a result of a qualifying mental disorder at the time of engaging in criminal conduct, the person lacks substantial capacity either to appreciate the criminality of the conduct or to conform the conduct to the requirements of the law." ORS 161.295(1). During the stipulated facts trial, the prosecutor described a report by a psychologist who had evaluated petitioner and concluded that it was likely that petitioner "was unable to conform his conduct to the requirements of the law" at the time of the crash "because of [his] underlying psychiatric condition." The prosecutor agreed with the psychologist's conclusion, informing the trial court that, at the time of the crash, petitioner had been acting pursuant to a "delusional set of beliefs." The court found petitioner "guilty except for insanity" on all three counts, placed him under the jurisdiction of the Psychiatric Security Review Board for an indefinite period not to exceed 20 years, and committed him to the Oregon State Hospital.

The trial court entered the judgment into the register on November 10, 2009. Petitioner did not appeal. Consequently, the two-year limitations period for filing for post-conviction relief expired on November 10, 2011.

B.  *Post-Conviction Trial-Level Proceedings*

On March 14, 2018, which was more than eight years after petitioner's convictions became final, petitioner, who was in custody at the state hospital, filed a *pro se*

petition for post-conviction relief. Petitioner requested and received a court-appointed lawyer, Patterson, who amended the petition twice.

In the operative petition, petitioner alleged that his convictions were the result of a substantial denial of his constitutional right to counsel under both Article I, section 11, of the Oregon Constitution, and the Sixth and Fourteenth Amendments to the United States Constitution. Specifically, he alleged that McCauley's representation had been inadequate and ineffective because, even though McCauley knew or should have known about petitioner's mental impairments, he had failed to ensure that petitioner understood the consequences of being found guilty except for insanity—including that he would likely spend 20 years at the state hospital—before encouraging him to waive his right to a jury trial and raise an insanity defense. Petitioner further alleged that he did not make—and, given his mental impairments could not have made—a knowing, voluntary, and intelligent waiver of his right to a jury trial.

In addition to alleging his grounds for relief, petitioner addressed the timing of his petition. He acknowledged that his petition was untimely but asserted that the escape clause applied because he could not reasonably have raised his grounds for relief within the two-year limitations period. In support of that assertion, petitioner alleged that, during the limitations period, he was "intellectually disabled as a result of his diagnosed schizophrenia and his forced consumption of extremely powerful psychotropic medications." He further alleged that his mental disease and medicated state "substantially impaired his ability to concentrate, to reason, to understand the legal remedies available to challenge his convictions, and to understand the legal proceedings that resulted in his imposed sentence." In addition, he alleged that his mental disease "substantially impaired his ability to read and comprehend legal documents related to those proceedings and deprived him of the ability to appreciate, identify, allege, and support with the requisite evidence, the relevant claims for relief." In a declaration attached to the petition, he stated that he filed his *pro se* petition as

soon as he was able to comprehend what had occurred in his underlying criminal case.

The state moved to dismiss the petition, asserting that it was barred by the statute of limitations, ORS 138.510(3). *See* ORCP 21 A(1)(i) (allowing a party to move to dismiss a claim before filing an answer on the ground that "the pleading shows that the action has not been commenced within the time limited by statute"). The state argued that, under Court of Appeals case law—including *Fisher v. Belleque*, 237 Or App 405, 240 P3d 745 (2010), *rev den*, 349 Or 601 (2011)—petitioner's mental impairments were irrelevant to whether the escape clause applied.

The post-conviction court granted the state's motion to dismiss. The court explained that it believed that cases decided by the Court of Appeals, including *Fisher*, precluded it from considering a petitioner's mental impairments when determining whether the escape clause applies. In *Fisher*, the petitioner acknowledged that his petition was untimely but asserted that the escape clause applied because he had mental illnesses that prevented him from raising his ground for relief within the limitations period. The Court of Appeals rejected that argument, holding that whether the escape clause applies "'turns on whether the information [necessary to raise the ground for relief at issue] *existed or was reasonably available to the petitioner*, and not on whether the petitioner's failure to seek the information was reasonable.'" *Fisher*, 237 Or App at 410 (quoting *Brown v. Baldwin*, 131 Or App 356, 361, 885 P2d 707 (1994) (emphasis in *Brown*)).

The post-conviction court told petitioner:

"The problem in your case is that my reading of what the courts that are above me tell me is that *** just because you have a mental illness and that mental illness prevents you from being able to access the legal process, that doesn't allow me to apply the exception. *** So it's my judgment that under the law that I [have] to grant the State's motion to dismiss.

"Now, you will have an opportunity to have my decision challenged and reviewed by the Court of Appeals. And I hope you do because there are some concerns I have about some of the decisions."

C.   *Post-Conviction Appeal*

Petitioner appealed, arguing that the allegations in his petition were sufficient to raise a triable issue regarding whether he "could not reasonably have raised" his grounds for relief within the two-year limitations period. ORS 138.510(3). The state disagreed, again arguing that, under *Fisher*, a post-conviction court may not apply the escape clause based on an allegation that, as a result of mental impairments, a petitioner lacked the capacity to file a timely petition. In reply, petitioner contended that this court's then-recent decision in *Gutale v. State of Oregon*, 364 Or 502, 435 P3d 728 (2019), implicitly overruled *Fisher*.

The Court of Appeals concluded that *Fisher*—which it described as holding "that a petitioner's diminished capacity due to mental disorders was not relevant to the escape clause in ORS 138.510(3)"—was on point. *Ingle*, 315 Or App at 424-25. The court also rejected petitioner's argument that *Gutale* implicitly overruled *Fisher. Id.* at 428. It noted that, on the same day that this court decided *Gutale*, it decided *Perez-Rodriguez v. State of Oregon*, 364 Or 489, 435 P3d 746 (2019), which expressly left open the question "'whether a petitioner's mental illness and intellectual disability may ever justify applying the escape clause'" in ORS 138.510(3). *Ingle*, 315 Or App at 428 (quoting *Perez-Rodriguez*, 364 Or at 498). It also noted that, in its view, *Gutale* did not involve consideration of the petitioner's personal characteristics. *Ingle*, 315 Or App at 429 (noting that, although the court in *Gutale* considered the petitioner's "situation," it "did not consider any personal characteristics of the petitioner"). Applying *Fisher*, the court held that petitioner's allegations regarding his mental impairments were irrelevant to whether petitioner "could not reasonably have raised" his grounds for relief within the limitations period. *Id.* at 429-30. Therefore, the court affirmed the post-conviction court's dismissal of the petition for failing to allege facts sufficient to support application of the escape clause. *Id.* at 430-31.

Judge Tookey dissented. Relying on *Gutale*, he contended that whether an untimely petition qualifies for the escape clause depends on whether it asserts a ground for relief that was not "'*reasonably available*'" to the petitioner

during the limitations period, which calls for a judgment about what was reasonable "'*under the circumstances*.'" *Id.* at 440 (Tookey, J., dissenting) (quoting *Gutale*, 364 Or at 509, 513 (emphases in *Ingle*)). Under *Gutale*, a determination of what was reasonable is based on the petitioner's perspective because the petitioner is the person who must initiate a post-conviction case. 364 Or at 519. Based on *Gutale* and the legislative history of ORS 138.510(3), which establishes that the legislature intended the escape clause to apply in "extraordinary circumstances," Judge Tookey would have held that, "in certain circumstances, a petitioner's mental illness is relevant to—and can justify application of—the escape clause." *Ingle*, 315 Or App at 432 (Tookey, J., dissenting). He would have further held that, when invoking the escape clause, "a petitioner must allege not only the existence of a mental illness but also some additional fact or facts about how, due to that mental illness, a reasonable person in the petitioner's situation would not have thought to investigate the existence of the asserted ground for relief during the limitation period." *Id.* at 433. Finally, he would have held that petitioner's allegations were sufficient. *Id.* at 452.[2]

D.   *Parties' Arguments on Review*

Petitioner petitioned this court for review, which we allowed. On review, petitioner argues that mental impairments can justify the application of the escape clause in ORS 138.510(3), depending on their severity and length. Petitioner points to the text of the escape clause, which applies when grounds for relief "could not reasonably have been raised," and argues that the legislature's use of the words "could" and "raised" indicate that the applicability of the escape clause depends on a petitioner's capacity to initiate a post-conviction case. Petitioner also relies on this court's cases for the proposition that the escape clause applies when a ground for relief was not "reasonably available" to a petitioner within the two-year limitations period,

_____

[2] The majority stated that, if this court were to overrule *Fisher* and hold that a petitioner's mental impairments must be considered when determining whether the escape clause in ORS 138.510(3) applies, it "would likely agree with the dissent that petitioner's allegations in this case would suffice to create a triable issue," but that it did not need to decide the issue. *Ingle*, 315 Or App at 431 n 9.

which depends on the petitioner's particular circumstances. *Gutale*, 364 Or at 509-12 (holding that the escape clause applied to the petitioner's immigration-related claim where the petitioner was not on notice that his plea carried immigration consequences); *Perez-Rodriguez*, 364 Or at 500 (reaching the opposite conclusion where the petitioner was on notice that his plea carried immigration consequences). And petitioner contends that the legislature intended the escape clause to apply in extraordinary circumstances and to prevent injustice, which supports its application in situations where, as a result of mental impairments, a petitioner did not have a reasonable opportunity to initiate a post-conviction case within the limitations period.

The state argues that a petitioner's mental impairments cannot justify the application of the escape clause in ORS 138.510(3) for untimely petitions. In support of that argument, the state points out that the wording of the escape clause in ORS 138.510(3) was imported from the escape clause in ORS 138.550(3) for successive post-conviction petitions, which allows for successive petitions that assert grounds for relief that "could not reasonably have been raised" in the petitioner's initial case. Based on the fact that the wording of the escape clause for untimely petitions was imported from the escape clause for successive petitions, the state makes the following multi-step argument:

(1)   the escape clause for successive petitions applies to claims that could not have been raised in a petitioner's initial post-conviction case because they had not accrued yet;

(2)   a claim accrues either when a plaintiff discovers their legal injury or when they reasonably should have discovered it, whichever comes first;

(3)   when determining when a plaintiff reasonably should have discovered a legal injury, courts employ an objective test and do not consider the plaintiff's personal characteristics; and

(4)   because the wording of the escape clause in ORS 138.550(3) for successive petitions was imported into the escape clause in ORS 138.510(3) for untimely petitions, a court cannot consider a petitioner's personal characteristics when determining whether to allow an untimely petition.

## II. DISCUSSION

To resolve the parties' dispute, we must construe the statute of limitations for post-conviction petitions, ORS 138.510(3). When construing a statute, our goal is to ascertain the legislature's intent. To do so, we look to the statute's text, context, and legislative history, as well as our prior constructions of the statute. *State v. Haley*, 371 Or 108, 112, 531 P3d 142 (2023); *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009). We begin with the text and our prior holdings regarding the text.

### A. *Statutory Interpretation*

#### 1. *Text*

In pertinent part, ORS 138.510(3) provides, "A petition pursuant to ORS 138.510 to 138.680 must be filed within two years" of the date the challenged conviction becomes final unless the grounds for relief asserted "could not reasonably have been raised" within the two-year limitations period.[3] Thus, as discussed above, the statute of limitations includes a two-year limitations period and an escape clause. The two-year limitations period begins to run on the date a person's conviction becomes final, and that date depends

_____

[3] ORS 138.510(3) provides:

"A petition pursuant to ORS 138.510 to 138.680 must be filed within two years of the following, unless the court on hearing a subsequent petition finds grounds for relief asserted which could not reasonably have been raised in the original or amended petition:

"(a) If no appeal is taken, the date the judgment or order on the conviction was entered in the register.

"(b) If an appeal is taken, the date the appeal is final in the Oregon appellate courts.

"(c) If a petition for certiorari to the United States Supreme Court is filed, the later of:

"(A) The date of denial of certiorari, if the petition is denied; or

"(B) The date of entry of a final state court judgment following remand from the United States Supreme Court."

As we explain below, 371 Or at 436-37, because the escape clause in ORS 138.510(3) for untimely petitions was imported from the escape clause in ORS 138.550(3) for successive petitions, it refers to grounds for relief "which could not reasonably have been raised in *the original or amended petition*." (Emphasis added.) Despite the reference to earlier petitions, this court has held that the escape clause for untimely petitions is not limited to those preceded by timely petitions. *Bartz v. State of Oregon*, 314 Or 353, 839 P2d 217 (1992).

on whether the person appeals the conviction. If, as in this case, a person does not appeal their conviction, the two-year period begins when the judgment on the conviction is entered in the register. ORS 138.510(3)(a).

A person seeking post-conviction relief must file a petition within the two-year limitations period unless the petition qualifies for the escape clause, that is, unless the petition asserts grounds for relief that "could not reasonably have been raised" within the two-year limitations period. The petitioner bears the burden of proving that the escape clause applies. *Perez-Rodriguez*, 364 Or at 499. If a petitioner is indigent and wants to be represented by a court-appointed lawyer, the petitioner must file a *pro se* petition and an affidavit stating that they are unable to pay for a lawyer. ORS 138.590. If the post-conviction court appoints a lawyer for the petitioner, the lawyer may amend the petition. ORS 138.590(5). Thus, an indigent person who needs the assistance of a lawyer to litigate their post-conviction case must file a *pro se* petition and a statement of indigence before they can secure that assistance.

The escape clause uses the word "could." It applies only if the ground for relief at issue "could not reasonably have been raised" within the limitations period. Stated conversely, it does not apply if the ground for relief could reasonably have been raised within that period. As this court has observed, "could" "connotes capability, as opposed to obligation." *Verduzco*, 357 Or at 566 (so stating regarding the escape clause in ORS 138.550(3) for successive petitions (internal quotation marks omitted)). And, as this court has held, when determining whether a ground for relief could reasonably have been raised within the limitations period, courts are to focus on the petitioner. *Gutale*, 364 Or at 519 ("[T]he inquiry * * * is whether a petitioner reasonably could have raised a ground for relief *before any litigation has occurred*. The focus of the reasonableness inquiry is therefore the petitioner, rather than an attorney representing the petitioner." (Emphasis in original.)). Thus, the legislature's use of the word "could" indicates that the escape clause applies if the petitioner lacked the capability to reasonably raise their ground for relief within the limitations period.

The escape clause also uses the word "reasonably." As this court has explained regarding the escape clause in ORS 138.550(3) for successive petitions, "the adverb 'reasonably' modifies the phrase, 'could *** have raised.'" *Verduzco*, 357 Or at 566 (omission in original). As a result of that adverb, the question "is not whether a petitioner conceivably could have raised the grounds for relief," but rather "whether the petitioner reasonably could have raised those grounds." *Id*. That question "calls for a judgment about what was 'reasonable' under the circumstances." *Id*. Thus, the word "reasonably" indicates that whether the escape clause applies depends on the petitioner's circumstances and what was reasonable under those circumstances. In other words, it depends on whether the petitioner "reasonably could have been expected" to have raised the ground for relief at issue within the limitations period. *Eklof v. Steward*, 360 Or 717, 733, 385 P3d 1074 (2016); *see also North v. Cupp*, 254 Or 451, 456, 461 P2d 271 (1969), *cert den*, 397 US 1054 (1970) (holding that ORS 138.550(1) precludes a petitioner from making a claim in a post-conviction case that the petitioner did not make in the underlying criminal case, except in certain circumstances, including where the claim "could conceivably have been made but could not reasonably have been expected").

In addition, the escape clause uses the word "raised." Thus, the clause's applicability depends on a petitioner's capability to take a specific action: to raise a ground for relief. The legislature's use of the word "raised" suggests that, when assessing whether the escape clause applies, courts are to consider not only whether a petitioner was on notice of a possible ground for relief but also whether the petitioner was able to take the steps necessary to bring the ground for relief before a court.

In summary, the text of the escape clause and our cases construing that text indicate that, when determining whether the escape clause applies, a court must consider a petitioner's capabilities under the circumstances that existed during the limitations period. They also indicate that whether the escape clause applies does not depend on whether it was conceivably possible for the petitioner to

raise the ground for relief during the limitations period, but, rather, whether it was reasonably possible for the petitioner to do so. And, they indicate that the focus of the inquiry should be on whether it was reasonably possible for the petitioner to take the steps necessary to bring the ground for relief before a court. Together, those indications suggest that whether the escape clause applies depends on whether it would be reasonable to expect a petitioner to have raised the ground for relief at issue given the circumstances that existed during the limitations period; if it would be unreasonable to expect the petitioner to have done so, then the escape clause applies.

2.   *Case law*

For additional guidance regarding when the escape clause applies, we turn to several of our cases involving the clause, including our first case construing the clause, *Bartz v. State of Oregon*, 314 Or 353, 839 P2d 217 (1992), and our most recent cases construing it, *Gutale*, and *Perez-Rodriguez*.

In *Bartz*, the petitioner filed an untimely post-conviction petition asserting that his constitutional right to counsel had been violated in the underlying criminal case because his defense lawyer had failed to inform him of a statutory defense. In his petition, Bartz asserted that the escape clause applied because he had been unaware of the statutory defense during the limitations period, which, at the time, was 120 days. To determine whether his claim of ineffective assistance of counsel "could not reasonably have been raised" within the limitations period, this court focused on whether the legal basis for the claim was "reasonably available" to Bartz during that period. 314 Or at 359-60. It framed the issue as "whether the extant statutes pertaining to a particular criminal offense constitute information that is reasonably available to a defendant convicted of that offense." *Id.* at 359. It then explained:

> "It is a basic assumption of the legal system that the ordinary means by which the legislature publishes and makes available its enactments are sufficient to inform persons of statutes that are relevant to them. *See Dungey v. Fairview Farms, Inc.*, 205 Or 615, 621, 290 P2d 181 (1955) (every person is presumed to know the law). Accordingly, we hold that

> the relevant statutes were *reasonably available* to Bartz when his conviction became final. The failure of Bartz's counsel to advise him of all available statutory defenses thus is not a 'ground[] for relief *** which could not reasonably have been raised' timely. *** The exception to the 120-day limitation is not available to Bartz *under the circumstances here*."

*Bartz*, 314 Or at 359-60 (brackets and first omission in original; emphases added). Thus, the court concluded that whether the escape clause applied to Bartz's petition depended on whether the information Bartz needed to raise his ground for relief had been reasonably available to him during the limitations period, and it further concluded that, because the information that Bartz needed was a published statute, it had been reasonably available to him and, therefore, the escape clause did not apply under the circumstances. *Id.* Notably, Bartz did not assert that he could not actually access the statute. He did not, for example, assert that he was physically or mentally incapable of accessing the statute. *See Gutale*, 364 Or at 528 n 4 (Balmer, J., dissenting) (distinguishing between a case where a petitioner failed to access available laws and one where "the petitioner was denied access to the laws, or where the state's actions were responsible for the petitioner's ignorance"); *see also Canales-Robles v. Laney*, 314 Or App 413, 419-20, 498 P3d 343 (2021) (concluding that, if true, the petitioner's allegation that the state prevented him from bringing a claim by depriving him of access to all legal materials was sufficient to establish that the escape clause applied).

In *Gutale*, this court provided additional guidance regarding the scope of the escape clause. In his underlying criminal case, Gutale pleaded guilty to one charge, a Class A misdemeanor, and the other charges were dismissed. At his sentencing hearing, Gutale told the trial court that he was pleading guilty because he wanted to travel and to obtain United States citizenship. Neither Gutale's defense lawyer nor the trial court said anything that would have indicated to Gutale that his plea could result in immigration consequences. More than two years after his conviction became final, immigration agents detained Gutale. Thereafter, Gutale filed a post-conviction petition. In it, he asserted

that the escape clause applied because he had been unaware of the possibility that his plea could result in immigration consequences until he was detained. On the state's motion, the trial court dismissed the petition. The Court of Appeals affirmed, relying on its decision in *Benitez-Chacon v. State of Oregon*, 178 Or App 352, 37 P3d 1035 (2001). *Gutale v. State of Oregon*, 285 Or App 39, 44, 395 P3d 942 (2017). That court explained that in *Benitez-Chacon* it had relied on *Bartz* to hold that "a petitioner is presumed to know immigration laws and, consequently, a petitioner's subjective lack of awareness of the legal consequences of a plea will not delay the time in which a petition must be filed under ORS 138.510(3)." *Id.* at 41.

On review, this court reversed, holding that *Bartz* was not controlling:

"[N]otwithstanding the citation to *Dungey*, this court's analysis in *Bartz* did not turn on a presumption that people know the law. Instead of presuming that the petitioner *knew* the law, the court in *Bartz* concluded that the legal basis for the petitioner's claim was *reasonably available* to the petitioner. The court reached that conclusion because, if the petitioner had looked, the law could have been found in publicly available sources. *** [T]he court held that, because 'it is a basic assumption of the legal system that the ordinary means by which the legislature publishes and makes available its enactments are sufficient to inform persons of statutes that are relevant to them,' the statutes pertaining to the petitioner's crime of conviction 'were *reasonably available* to [the petitioner] when his conviction became final.' *** Thus, consistent with our other decisions interpreting the escape clause, the court's analysis in *Bartz* turned on whether the legal basis for the petitioner's claim was reasonably available to him. And the court concluded that it was."

*Gutale*, 364 Or at 510 (quoting *Bartz*, 314 Or at 359-60 (emphasis and brackets in *Gutale*)). This court went on to hold that whether the basis for a ground for relief is reasonably available to a petitioner depends on the petitioner's circumstances. *Id.* at 511-13. Those circumstances include whether the petitioner would have been on notice of the need to investigate the existence of the ground for relief. *Id.* at 510-11 ("Being reasonably available means more than just

that a petitioner could have found the law if he or she had looked. Instead, a ground for relief is reasonably available only if there was a reason for the petitioner to look for it."). The court then considered the particular circumstances that Gutale had alleged in his petition, including that he had told the trial court that he planned to travel and become a United States citizen and that neither his defense lawyer nor the trial court told him that his plea could result in immigration consequences. *Id.* at 513. The court concluded that those allegations, if true, were sufficient to establish that the escape clause applied and, therefore, the post-conviction court had erred in dismissing the petition. *Id.* at 520.

The court reached the opposite conclusion in *Perez-Rodriguez*, which it issued the same day as *Gutale*. Like Gutale, Perez-Rodriguez filed an untimely post-conviction petition asserting both that his defense lawyer had failed to inform him of the immigration consequences of his plea and that the escape clause applied because he had been unaware of the possibility that his plea could result in immigration consequences until after the limitations period had run. But, unlike Gutale, Perez-Rodriguez was "on notice of potential immigration consequences." *Perez-Rodriguez*, 364 Or at 497. Although he had not been told that there would be immigration consequences, he was told that there might be. Therefore, the court concluded, "it was incumbent on him to determine what those immigration consequences might be and whether his trial counsel had failed to accurately communicate those consequences to him." *Id.* Consequently, the court rejected Perez-Rodriguez's argument that the escape clause applied because he had been unaware of the immigration consequences of his plea until the limitations period had run. *Id.*

In addition to that argument, Perez-Rodriguez argued that the escape clause applied because he had a mental illness and intellectual disability that prevented him from knowing that he had a ground for relief within the limitations period. That argument gave rise to two questions:

"(1) whether a petitioner's mental illness and intellectual disability may ever justify applying the escape clause and (2) if so, whether the particular mental illness and

intellectual disability that petitioner alleges are sufficient allegations to establish, for assessing the state's motion to dismiss, that petitioner could not reasonably have brought his claim during the limitations period."

*Id.* at 498. The court determined that it did not need to resolve the first question, explaining that, "even if a petitioner's mental illness and intellectual disability *could* justify applying the escape clause, petitioner's specific allegations here would not justify applying the escape clause in this case." *Id.* at 499 (emphasis in original). The court further explained that the petitioner's allegations failed to establish "that he did not have the capacity to file his petition" within the limitations period. *Id.* at 500. It noted that petitioner had not alleged, "for example, that his mental illness led to any—let alone, prolonged—periods of psychosis during the limitations period." *Id.* "Instead," the court pointed out that

> "the pleadings and record show that petitioner has *had three psychotic breaks in his life: two before his conviction and one after the limitations period expired.* Simply having schizoaffective disorder is, by itself, insufficient. *See United States v. Sosa*, 364 F3d 507, 513 (4th Cir 2004) (holding that schizoaffective disorder does not constitute 'profound mental incapacity' needed to satisfy one element of equitable tolling for federal habeas claim); *Grant v. McDonnell Douglas Corp.*, 163 F3d 1136, 1138 (9th Cir 1998) (holding that equitable tolling based on mental condition may be appropriate 'only in exceptional circumstances, such as institutionalization or adjudged mental incompetence')."

*Perez-Rodriguez*, 364 Or at 500 (emphasis added). Therefore, the court affirmed the trial court's dismissal of the petition. *Id.*

In sum, this court has addressed the scope of the escape clause in ORS 138.510(3) in several cases. Those cases establish that the fact that a petitioner was unaware of the basis for a ground for relief during the limitations period is insufficient, in and of itself, to trigger the escape clause. *Bartz*, 314 Or at 359-60. They also establish that whether the clause applies does not depend solely on whether the law or facts on which a ground for relief depends existed during the limitations period; it also depends on whether the petitioner had a reason to investigate the ground for relief.

*Gutale*, 364 Or at 512. Whether a petitioner had such a reason depends on the petitioner's particular circumstances, which can include what the petitioner was told. *Id.* at 513; *Perez-Rodriguez*, 364 Or at 497. Overall, this court's cases construing the escape clause in ORS 138.510(3) are consistent with what the text of the clause indicates: that the escape clause applies when, given the circumstances that existed during the limitations period, it would be unreasonable to expect the petitioner to have filed a timely petition raising the ground for relief at issue.

### 3. *Context*

The general context of the statute of limitations supports that view. As both parties acknowledge, "Oregon has always had a statute suspending the running of the statutes of limitation for persons under certain disabilities, including insanity." *DeLay v. Marathon LeTourneau Sales & Serv. Co.*, 291 Or 310, 313, 630 P2d 836 (1981). Oregon's original statute providing for tolling stated:

> "If [a] person entitled to bring an action mentioned in this title * * * be, at the time the cause of action accrued, * * *
>
> "* * * * *
>
> "Insane; * * *
>
> "* * * * *
>
> "The time of such disability shall not be a part of the time limited for the commencement of the action[.]"

General Laws of Oregon, Civ Code, ch I, title II, § 17, p 108 (Deady & Lane 1843-1872). With slight modification, that provision was later included in the Oregon Revised Statutes. ORS 12.160 (1955). And, at the time that the legislature enacted the statute of limitations for post-conviction claims, Oregon law continued to provide for tolling of statutes of limitations based on insanity:

> "If, at the time the cause of action accrues, any person entitled to bring an action mentioned in [other parts of ORS chapter 12] is:
>
> "* * * * *

"Insane; \* \* \*

"\* \* \* \* \*

"The time of such disability shall not be a part of the time limited for the commencement of the action[.]"

ORS 12.160 (1987). Oregon's long history of tolling statutes of limitations due to a party's insanity provides context for what the legislature would have understood to be "extraordinary circumstances" for the purpose of the escape clause.[4]

### 4. *Legislative history*

For final guidance regarding the applicability of the escape clause, we turn to its legislative history. The Oregon legislature enacted the Post-Conviction Hearing Act (PCHA) in 1959. Or Laws 1959, ch 636. The PCHA did not include a statute of limitations. To the contrary, it provided that "[a] petition \* \* \* may be filed without limit in time."

---

[4] To be sure, the statute of limitations for post-conviction petitions does not contain a tolling provision; instead, it has an escape clause. Our point is simply that, when the legislature created the escape clause for "extraordinary circumstances," insanity had long been treated as an extraordinary circumstance that could be the basis for allowing claims that would otherwise be time-barred to proceed.

The state points out that the tolling provision for insanity is limited by a statute of ultimate repose, but that the escape clause in ORS 138.510(3) is not. That is true, but it is consistent with how the legislature has treated untimely post-conviction claims; there is no statute of ultimate repose for such claims.

The state also points out that, in the statute of limitations context, there is a difference between "accrual" and "tolling." It asserts that

"[a]ccrual is when a statute of limitations begins to run and is governed by a 'discovery rule' that operates independently of a claimant's mental condition. Tolling, by contrast, pauses a limitations clock from running on an accrued claim, and a claimant's mental condition has long been a basis for *tolling* the time limit on an accrued claim, not an impediment to accrual itself."

(Emphasis in original.) The state then argues that the escape clause in ORS 138.510(3) is only an "accrual rule."

The state's effort to compare the statute of limitations for post-conviction petitions to other statutes of limitations is understandable, but the statute of limitations for post-conviction petitions is unique. It does not work the same way as other statutes of limitations, because its limitations period starts to run from a specific date—when a conviction becomes final—and that date is independent of when a claim "accrues" in the sense that a plaintiff knows or has reason to know of a claim. That is, the post-conviction statute does not have an ordinary discovery accrual rule; instead, it has the escape clause, which is broad enough to cover both circumstances where a petitioner did not know or have reason to know of their ground for relief and circumstances where a petitioner was incapable of taking the steps necessary to raise their ground for relief within the limitations period.

*Id.* at § 17; ORS 138.510(2) (1959). But the PCHA included a limit on successive petitions. Section 15(3) of the PCHA stated:

> "All grounds for relief claimed by petitioner in a petition pursuant to [the PCHA] must be asserted in his original or amended petition, and any grounds not so asserted are deemed waived unless the court on hearing a subsequent petition finds grounds for relief asserted therein which could not reasonably have been raised in the original or amended petition."

Or Laws 1959, ch 636, § 15(3). Thus, the PCHA included a section that required a petitioner to raise all their grounds for relief in their initial post-conviction case, but that requirement had an exception for grounds for relief that "could not reasonably have been raised in the original or amended petition." That section was codified as ORS 138.550(3), which has remained substantively unchanged since its enactment. ORS 138.550(3) "codifies claim preclusion principles." *Gutale*, 364 Or at 518.

> "It addresses the question of whether a petitioner who already has litigated a petition for post-conviction relief may return to court and litigate a second time, and it provides that a petitioner may not do so where counsel reasonably could have raised the grounds at issue in that prior litigation."

*Id.*

In 1989, 30 years after the enactment of the PCHA, the legislature established a statute of limitations for post-conviction petitions. Or Laws 1989, ch 1053, § 18. During the 1989 legislative session, the legislature considered several post-conviction bills, two of which ultimately included statutes of limitations: House Bill (HB) 2796 (1989) and Senate Bill (SB) 284 (1989). As explained below, HB 2796 did not become law, but its statute of limitations was added to SB 284, which did.

Representative Ray Baum introduced HB 2796, proposing a 120-day limitations period for filing post-conviction petitions. Tape Recording, House Floor, HB 2796, Apr 27, 1989, Tape 17, Side 1. The limitations period was intended to further the legislature's goal of reducing the

costs of the state's indigent defense programs. *Id.* (statement by Representative Baum). Representative Baum, a lawyer who had represented petitioners in post-conviction cases, explained that the purpose of the limitations period was to reduce the number of frivolous post-conviction petitions. He stated, "[L]et me just tell you, the reason I did this bill was, having been court appointed on close to 100 cases, finding only five percent or less to be meritorious, I found that as time goes on, you sit there and think about things you're going to appeal on and most of those things are frivolous." Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2796, Mar 9, 1989, Tape 45, Side A. Similarly, a representative of the Oregon Department of Justice, Brenda Peterson, described petitions filed ten years after a conviction became final as "[s]omething to do, stir up a little trouble." *Id.* In keeping with those statements, a Staff Measure Summary informed legislators that, "if a person has a genuine basis for appeal, the person will seek post-conviction relief soon after conviction" and that "[t]he proposed time limitation may result in less frivolous suits being filed." Exhibit C, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2796, Mar 9, 1989.

       As originally introduced, the limitations period in HB 2796 did not have an escape clause. But, after the State Court Administrator pointed out that ORS 138.550(3), which limits successive petitions, has an escape clause, the subcommittee amended HB 2796 to include an escape clause. Exhibit G, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2796, Mar 9, 1989 (testimony of State Court Administrator R. William Linden, Jr.); Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2796, Apr 4, 1989, Tape 60, Side B (amending bill). To do so, the subcommittee imported the wording of the escape clause in ORS 138.550(3) for successive petitions. Consequently, HB 2796's escape clause provided, in part, that a petition for post-conviction relief must be filed within 120 days of the date the conviction becomes final, "unless the court on hearing a subsequent petition finds grounds for relief asserted which could not reasonably have been raised in the original or amended petition."

Exhibit Y, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2796, Apr 4, 1989 (text of the amendment).

Representative Kevin Mannix described the escape clause as "an escape valve for extraordinary circumstances." Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2796, Apr 4, 1989, Tape 60, Side B. Similarly, a Staff Measure Summary informed legislators that the escape clause is "a 'safety valve' for those who had valid reasons for not raising grounds for relief within the time limit." Exhibit CC, House Committee on Judiciary, HB 2796, Apr 18, 1989. The House passed the bill to the Senate, but the bill did not become law.

During the same session, the Senate considered SB 284, which concerned indigent defense expenses. As originally introduced, SB 284 did not include a limitations period for post-conviction cases. Exhibit, Senate Committee on Judiciary, SB 284, Apr 12, 1989 (hand engrossed amendments); Tape Recording, Senate Committee on Judiciary, SB 284, Apr 12, 1989, Tape 111, Side A. However, once the Senate passed the bill to the House, the House amended the bill to add the 120-day limitations period and the escape clause from HB 2796. Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 284, June 12, 1989, Tape 123, Side A (amending bill). A representative of the Oregon Criminal Defense Lawyers Association, Ross Shepard, testified in support of the addition of the escape clause, noting that it would "allow filings outside of the 120 days if extraordinary circumstances could be shown." Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 284, June 12, 1989, Tape 122, Side A. Shepard described those circumstances as circumstances where "there was no reasonable way that a person could have brought up those grounds for relief within the [limitations] period." Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 284, June 12, 1989, Tape 123, Side A. As examples, Shepard mentioned circumstances where evidence is discovered or the law changes after the limitations period. Tape Recording, House

Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 284, June 12, 1989, Tape 122, Side A (describing a hypothetical situation involving late discovery of evidence of collusion between a prosecutor and a defense lawyer); Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 284, June 12, 1989, Tape 123, Side A (referring to a situation where the statute that a defendant was convicted of violating is later declared unconstitutional).

To recap, the original PCHA, which was enacted in 1959, did not include a statute of limitations. The legislature did not create one until 30 years later, in 1989. The 1989 statute of limitations included a 120-day limitations period and an escape clause. The ideas underlying the statute were that persons with "genuine" claims seek post-conviction relief "soon after conviction" and that petitions filed long after a conviction are more likely to be "frivolous." Exhibit C, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2796, Mar 9, 1989 (staff measure summary). Notably, the legislature did not bar all claims filed after the limitations period; it included an escape clause, which it intended to apply in "extraordinary circumstances," which include circumstances where "there was no reasonable way" that a person could have raised the ground for relief within the limitation period. Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 284, June 12, 1989, Tape 123, Side A (statement by Ross Shepard).

As mentioned, when creating the statute of limitations' escape clause, the legislature imported wording from ORS 138.550(3), which concerns successive petitions. Because the imported wording concerns grounds for relief raised in "*a subsequent petition*" that "could not reasonably have been raised in *the original or amended petition*," it was unclear whether the statute of limitations' escape clause is available to all persons who file late petitions or only those who previously filed timely petitions. ORS 138.510(3) (emphases added). This court addressed that issue in *Bartz*.

As discussed above, Bartz filed an untimely petition for post-conviction relief on the ground that his defense

lawyer had failed to advise him of a statutory defense, and Bartz asserted that the escape clause applied because he had been unaware of the defense within the limitations period. This court ultimately rejected that argument, but before the court could reach that argument, it had to resolve a preliminary issue: whether the escape clause in ORS 138.510(3) for untimely claims is available for petitioners like Bartz, whose petition was untimely, but not successive.

To resolve that issue, the court first looked to the statute of limitations' text. It concluded that the text "is ambiguous" as to whether the statute's escape clause "applies to all late-filed petitions, or whether it is limited to late-filed petitions filed by persons who filed an earlier, timely petition." *Bartz*, 314 Or at 357. The court then turned to the statute's legislative history. It determined that the history "is silent on the present question." *Id.* It pointed out that, although the wording of the escape clause was "borrowed verbatim from ORS 138.550(3)," which concerns successive petitions, "[t]he legislative committees involved did not discuss the appropriateness of that wording in [the statute of limitations] context." *Id.* at 358. Finally, the court considered the purpose of the statute of limitations' escape clause. Based on statements about the escape clause in the legislative history, the court concluded that the escape clause's purpose "is to give persons extra time to file petitions for post-conviction relief in extraordinary circumstances." *Id.* The court then reasoned that "[t]hat purpose applies equally to persons who did and persons who did not file an earlier, timely petition." *Id.* Therefore, the court held that the escape clause "does not require the filing of a timely 'original or amended' petition as a prerequisite to the filing of an untimely petition." *Id.*

The *Bartz* court's resolution of that issue shows that, although the wording of the escape clause for untimely petitions was "borrowed verbatim" from the escape clause for successive petitions, the legislature did not intend the former to apply exactly the same way as the latter. It also shows that the purpose of the escape clause can provide guidance regarding the scope of the clause.

The year after *Bartz*, the legislature amended the statute of limitations to increase the limitations period

from 120 days to two years. Or Laws 1993, ch 517, § 1. As in 1989, the legislature was concerned about the costs of post-conviction cases. Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2352, Apr 7, 1993, Tape 70, Side A (statement by Ross Shepard highlighting concerns about indigent defense spending). It was also concerned about the amount of time that could pass between when a criminal case was originally litigated and when it was relitigated, if post-conviction relief was granted. *Id.* (statement by Representative Mannix reiterating his concerns about litigating 10-year-old cases). But the legislature had come to the conclusion that the 120-day limitations period was too short; it barred too many post-conviction petitions. Tape Recording, House Floor, HB 2352, May 4, 1993, Tape 78, Side B (Representative Peter Courtney's third reading of the bill).

Legislators' comments about the limitations period show that they wanted to allow persons a reasonable amount of time to identify and raise their post-conviction claims and that they believed two years would be enough time for most petitioners, including those with lower education levels. Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2352, Apr 7, 1993, Tape 70, Side A (Representative Kate Brown commenting, "My concern is the level of folks we're working with here, that sixty-seven percent of them don't have a high school education and a lot of them aren't even able to read, and I just think two years is a reasonable statute of limitations under the folks we're working with."); *see also id.* (Representative Mannix stating that "it doesn't take you very long to reflect on your conviction and the trial and the appeals process and decide whether or not you think you were railroaded.").

Although the legislature did not change the text of the escape clause, commenters shared their thoughts on its scope. Brenda Peterson stated that the "savings clause" would "take care of the hard cases" and would apply when petitioners "present reasons to the court" regarding "why they *** didn't file their petition" within the limitations period. *Id.* Representative Mannix described the escape

clause as "a savings clause for unconscionable situations where the system didn't work." *Id.*

Thus, the 1993 legislature amended the statute of limitations to increase the length of the limitations period. Its goal was to afford people a reasonable opportunity to determine whether they had a post-conviction claim and, if they did, to file a petition. They believed a two-year limitation period was sufficient for most petitions, but they retained the escape clause for petitions that assert grounds for relief that could not reasonably have been raised within that period. They assumed that most petitioners, even those with lower education levels, would be able to reflect on their convictions and decide whether to challenge them within the limitations period.

This court has reviewed the legislative history of the statute of limitations and its escape clause. Of particular relevance here, given the state's argument that the escape clause in ORS 138.510(3) for untimely petitions should be construed the same as the escape clause in ORS 138.550(3) for successive petitions, this court has continued to hold, as it did in *Bartz*, that, although the wording of ORS 138.510(3) was imported from ORS 138.550(3), the two clauses must be interpreted separately. In *Verduzco*, the petitioner filed a petition that was both untimely and successive, and this court held that whether the escape clause in ORS 138.510(3) for untimely petitions applied was a separate question from whether the escape clause in ORS 138.550(3) for successive petitions applied because, "[a]lthough both clauses are worded identically, one was enacted in 1959 while the other was enacted in 1989 and modified in 1993. The contexts that preceded the two clauses differ, as do their legislative histories." 357 Or at 564; *see also Gutale*, 364 Or at 518-19 (explaining that, given the different purposes of the escape clauses, the focus of the inquiry into whether a ground for relief could not reasonably have been raised differs).

In summary, the statute of limitations for post-conviction petitions was initially enacted in 1989, and it was amended in 1993. It was intended to help reduce the costs of the state's indigent defense programs by reducing the number of frivolous petitions. The wording of the statute's escape

clause was taken from the escape clause in ORS 138.550(3) for successive petitions. But, despite their identical wording, this court has held that, given their different contexts and legislative histories, the escape clauses must be interpreted separately. And, since *Bartz* (this court's first case construing the escape clause in ORS 138.510(3) for untimely petitions) and through *Gutale* and *Perez-Rodriguez* (this court's most recent cases construing that clause), this court has construed the two clauses differently. When construing the escape clause in ORS 138.510(3), this court has looked to its legislative history and purpose. The legislative history shows that, both in 1989 and 1993, the legislature believed that, in most cases, persons would have reason to, and be able to, raise their grounds for relief within the limitations period. Exhibit C, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2796, Mar 9, 1989 (staff measure summary stating that most people with a "genuine" ground for relief will file soon after conviction); Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2352, Apr 7, 1993, Tape 70, Side A (Representative Mannix explaining that, in general, people can readily reflect on their trials and convictions and decide whether they think they were "railroaded"). But the legislature recognized that that would not always be the case, so it created the escape clause. It intended the escape clause to apply in "extraordinary circumstances," including circumstances where there was no "reasonable way" that a petitioner could have raised a ground for relief. Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 284, June 12, 1989, Tape 123, Side A. In keeping with that legislative history, this court has held that the escape clause must be construed "narrowly." *Bartz*, 314 Or at 359.

B.  *Whether a Post-Conviction Court May Consider a Petitioner's Mental Impairments when Determining Whether the Escape Clause Applies*

        Having reviewed the text, context, and legislative history of the statute of limitations, as well as our cases construing the statute, we now apply the points we have drawn from that review to the general legal question presented by

this case: whether a post-conviction court may consider a petitioner's mental impairments when determining whether the statute of limitations' escape clause applies. The text indicates that a court may do so. The escape clause applies when a ground for relief "could not reasonably have been raised" and "could" connotes "capability." *Verduzco*, 357 Or at 566. And, when determining whether the escape clause applies, the proper focus is on the petitioner. *Gutale*, 364 Or at 519. Thus, the petitioner's capabilities matter. That understanding is in keeping with *Bartz*, in which this court held that whether the escape clause applies depends on whether a ground for relief was "reasonably available" to the petitioner during the limitations period; if a petitioner is incapable of taking the steps necessary to investigate whether a ground for relief exists, the ground is not reasonably available to the petitioner. That understanding is also in keeping with *Gutale*, where this court held that the escape clause applied because the petitioner did not have reason to investigate the ground for relief at issue during the limitations period; if the clause applies when a petitioner did not have a reason to investigate a ground for relief, it should apply when the petitioner did not have the capability to investigate a ground for relief.

Consider, for example, a situation where a person is in a comatose state throughout the limitations period. Such a person could not reasonably raise a ground for relief within the limitations period. We believe the same would be true for a person suffering from mental impairments during the limitations period if the mental impairments are so severe—both in terms of degree and duration—that it would be unreasonable to expect the person to take the steps necessary to bring the ground for relief before a court during the limitations period. Those steps may be minimal, and it may be reasonable to expect the person to seek out help in taking them. But, if the person cannot reasonably take those necessary steps, even with available assistance, then the escape clause applies.

That conclusion is consistent with the general context of the escape clause, specifically, Oregon's long history

of recognizing insanity as a reason for allowing untimely claims.

Finally, that conclusion is consistent with the legislative history and purpose of the escape clause. As discussed, the legislature created a statute of limitations that contains both a limitations period and an escape clause. It based the limitations period on an assumption that persons would be able to reflect on their convictions and take the necessary steps to challenge them within the limitations period, and it created the escape clause to cover extraordinary circumstances. Given the assumption underlying the limitations period, we conclude that the extraordinary circumstances include circumstances where a person, for reasons beyond their control, lacks the capability to take the minimal steps that the legislature believed that a person would be able to take during the limitations period.[5]

In arguing against that conclusion, the state asserts that, because wording of the escape clause in ORS 138.510 for untimely petitions was imported from the escape clause in ORS 138.550 for successive petitions, (1) the former should be construed the same as the latter and (2) the latter does not allow for consideration of a petitioner's mental condition. Specifically, the state argues:

> "The 1989 legislature borrowed the escape clause from existing law intended to codify the doctrine of claim preclusion and inserted it into ORS 138.510(3) without modification. The scope of claim preclusion is governed by the same 'discovery' accrual rule that also ordinarily sets statutes of limitations in motion, and the law has long held that

---

[5] As an example, consider the following hypothetical: A court enters judgment against two defendants on the same day. Neither appeals. Both defendants had solid alibi defenses against the crime of conviction, but their lawyers failed to investigate or raise the defenses. Defendant One files a petition for post-conviction relief within the limitations period and prevails. *See Lichau v. Baldwin*, 333 Or 350, 39 P3d 851 (2002) (granting post-conviction relief for inadequate assistance of counsel based on the failure to investigate an alibi defense and its prejudicial effect). Defendant Two falls into a coma on the day that the court entered the judgment and remains that way for two years. Defendant Two has a valid claim that was immediately available and did not depend on newly discovered information. We do not believe that the legislature intended Defendant Two's claim to be time-barred. The legislature was concerned with reducing frivolous claims and reducing costs, but it also included the escape clause as an exception for extraordinary situations. Application of the escape clause to Defendant Two's claim is consistent with the legislative discussions.

that discovery rule operates independently of the particular claimant's mental condition."

According to the state, "[i]t follows that," when the 1989 legislature enacted the statute of limitations for post-conviction claims, it intended the statute's escape clause "to operate as an accrual rule," more specifically, a "discovery accrual rule" under which a claim accrues "either when the plaintiff actually discovers their legal injury or when they *reasonably should have* discovered it, whichever occurs first." (Emphasis in original.) The state further argues that the discovery accrual rule "focuses on an abstraction—the 'objectively reasonable person'—rather than on the specific claimant at issue," and, therefore, does not allow for consideration of "the characteristics of the particular claimant," including "mental illness."

The state's argument, which the dissent echoes, is unavailing. First, and most importantly, the state's primary premise—that because the escape clause in ORS 138.510 for untimely petitions was imported from the escape clause in ORS 138.550 for successive petitions, the two clauses should be construed the same—is inconsistent with our case law. As explained above, this court has expressly, repeatedly, and consistently held that the two clauses must be construed separately given their different contexts, histories, and purposes. And, as *Gutale* and *Perez-Rodriguez* illustrate, whether the escape clause applies can depend on a petitioner's particular situation, including whether, based on the particular information the petitioner received, the petitioner would have had a reason to investigate a ground for relief. *Compare Gutale*, 364 Or at 512-13, *with Perez-Rodriguez*, 364 Or at 497.

Given that the primary premise of the state's argument is inconsistent with our case law, we need not determine whether its other premises—that the escape clause in ORS 138.550 is a discovery accrual rule and that, as a result, a plaintiff's personal characteristics are irrelevant to whether it applies—are correct. But we pause to note that, even assuming that the escape clause in ORS 138.550 is a discovery accrual rule, the state's assertion that a plaintiff's personal characteristics are irrelevant is too sweeping.

We have considered personal characteristics—specifically, age—when applying discovery accrual rules. *Doe v. Lake Oswego Sch. Dist.*, 353 Or 321, 333, 297 P3d 1287 (2013) ("[A] court must consider the facts from the perspective of a reasonable person in the circumstances of the plaintiff. Those circumstances include, but are not limited to, plaintiff's status as a minor, the relationship between the parties, and the nature of the harm suffered." (Citations omitted.)); *T.R. v. Boy Scouts of America*, 344 Or 282, 297, 181 P3d 758 (2008) (considering the plaintiff's age when applying a discovery accrual rule). And, in other contexts when applying a "reasonable person" or "reasonable care" test, we have stated that age and disability are relevant. *See Thomas v. Inman*, 282 Or 279, 285-86, 578 P2d 399 (1978) (concluding that a minor's age and intelligence are relevant to the "reasonable person" standard for negligence); *Biddle v. Mazzocco*, 204 Or 547, 556, 284 P2d 364 (1955) (stating that "[w]hether a child playing in the street, for example, is guilty of contributory negligence is determined from the standpoint of a child of like age and experience; and the conduct of a blind person on the street is tested by that of a reasonably prudent blind person in like or similar circumstances").

The state also argues that allowing post-conviction courts to consider a petitioner's mental impairments is inconsistent with the legislature's intent in enacting the statute of limitations, because the legislature intended to reduce the number of post-conviction cases. We agree with the state that the legislature intended to reduce the number of post-conviction cases, but for the reasons explained above, we believe that the existence of severe mental impairments constitutes the type of extraordinary circumstance that the legislature intended the escape clause to cover and, therefore, litigation regarding the existence of such impairments is consistent with the legislature's intent.

Moreover, the amount of litigation will be limited by the fact that the bar for establishing that the escape clause applies is high. The escape clause is narrow, and the petitioner bears the burden of alleging facts sufficient to establish that it applies. In other contexts, courts already consider mental impairments when determining whether

an untimely case can proceed, and the approaches used in those cases can guide litigants and courts as they determine whether the escape clause applies. For example, federal courts have held that a person's mental impairments can justify equitable tolling of the limitations period for habeas corpus claims and have set out requirements for such tolling. *See, e.g.*, *Bills v. Clark*, 628 F3d 1092, 1097 (9th Cir 2010) (holding that the threshold for triggering equitable tolling is "very high" and setting out requirements); *see also Milam v. Harrington*, 953 F3d 1128, 1130-33 (9th Cir 2020) (holding that the district court erred in refusing to consider whether a federal habeas petitioner's mental impairment caused the untimely filing of his petition). In *Bills*, the Ninth Circuit held that, to trigger equitable tolling, a petitioner must prove that "his mental impairment was an 'extraordinary circumstance' beyond his control." 628 F3d at 1099. To do so, the petitioner must prove that his "impairment was so severe" that it rendered him "unable rationally or factually to personally understand the need to timely file" or "unable personally to prepare a habeas petition and effectuate its filing." *Id.* at 1100. In addition, the petitioner "must show diligence in pursuing the claims to the extent he could understand them, but that the mental impairment made it impossible to meet the filing deadline under the totality of the circumstances, including reasonably available access to assistance." *Id.*

C.   *Whether Petitioner's Allegations Are Sufficient to Support Application of the Escape Clause*

Having concluded that a post-conviction court can consider a petitioner's mental impairments when determining whether the escape clause in ORS 138.510(3) applies to an untimely petition, we now turn to the question of whether petitioner's allegations in this case are sufficient to support application of the clause. Because the state moved to dismiss petitioner's case on the pleadings, we assume the truth of petitioner's allegations. As described above, petitioner alleged that, during the limitations period, he was "intellectually disabled as a result of his diagnosed schizophrenia and his forced consumption of extremely powerful psychotropic medications." He further alleged that his

disability prevented him from understanding both what had happened in his underlying criminal case and what he could do to challenge his convictions. And he alleged that his mental impairments "deprived him of the ability to appreciate, identify, allege, and support with the requisite evidence, the relevant claims for relief." Those allegations, if true, are sufficient to establish that, as a result of mental impairments that existed throughout the limitations period and were beyond his control, petitioner lacked the ability to take the necessary steps to initiate a post-conviction case. As such, they are sufficient to trigger the escape clause. Therefore, the post-conviction court erred in granting the state's motion to dismiss on the pleadings.[6]

## III. CONCLUSION

To recap, when the legislature created the statute of limitations for post-conviction petitions, ORS 138.510(3), it included both a limitations period and an escape clause. The legislature believed that, in most circumstances, petitioners would be able to take the steps necessary to raise their grounds for relief within the limitations period, but it created the escape clause to cover extraordinary circumstances. The escape clause applies when a ground for relief "could not reasonably have been raised" within the limitations period. The words used in the clause and our cases construing them indicate that whether the clause applies depends on the petitioner's capabilities under the circumstances that existed during the limitations period. When assessing those capabilities, the question is not whether the petitioner conceivably could have raised the ground for relief, but whether the petitioner reasonably could have done so. Stated differently, the question is whether it would be reasonable to expect the petitioner to have raised the ground for relief. A petitioner's mental impairments are relevant to that question. If a petitioner's mental impairments are so severe—both in terms of degree and duration—that it would be unreasonable to expect the petitioner to have taken the steps necessary to raise a ground for relief, even with available assistance, then the escape clause applies. But, because

---

[6] Whether petitioner will be able to present sufficient evidence to support those allegations at later stages of the case is a separate matter.

the escape clause is narrow, the bar for establishing that level of impairment is high. Here, petitioner's allegations, if true, are sufficient to support application of the escape clause. Therefore, the post-conviction court erred in granting the state's motion to dismiss on the pleadings.

The decision of the Court of Appeals is reversed. The judgment of the circuit court is reversed, and the case is remanded to that court for further proceedings.

**GARRETT, J.,** dissenting.

I would affirm the judgment below. As this court has long described it, the "escape clause" in ORS 138.510(3) reflects the legislature's intent that, in "extraordinary circumstances," post-conviction petitioners should be able to bring claims after the expiration of the statute of limitations. *Bartz v. State of Oregon*, 314 Or 353, 358-59, 839 P2d 217 (1992) (the provision is "meant to be construed narrowly"). Adhering carefully to this court's case law, the Court of Appeals held that the escape-clause analysis uses a "reasonable person" test that does not turn on a petitioner's personal characteristics. *Ingle v. Matteucci*, 315 Or App 416, 501 P3d 23 (2021). The majority today rejects that view, holding that petitioner may invoke the escape clause based on a showing that, because of his serious mental illness, he could not reasonably have raised his post-conviction claim earlier than he did.

The majority's holding has significant implications for the frequency with which petitioners will be able to raise late claims. The question before us is how the legislature, which added the escape clause in 1989 and addressed it again in 1993, intended for the statute to work. Based on the statutory text in context, as previously construed by this court, along with the legislative history, I am not persuaded that the legislature intended the escape clause to be as expansive as the majority's reasoning would have it. Rather, the legislature intended for a post-conviction court to ask whether the information necessary to assert a claim was *available* within the statute of limitations—viewed from the perspective of a reasonable person. Personal characteristics such as mental illness are not the sort of "extraordinary"

circumstance that the legislature anticipated would justify an untimely claim.

Beginning with the text, ORS 138.510(3) provides:

> "A petition pursuant to ORS 138.510 *** must be filed within two years of [certain identified events], unless the court on hearing a subsequent petition finds *grounds for relief asserted which could not reasonably have been raised* in the original or amended petition[.]"

(Emphasis added.) The majority interprets that wording to ask whether a particular petitioner could have asserted a claim. That is not the most natural reading of the text, however, which refers to whether "grounds for relief" could "reasonably" have been raised and not whether a specific person had the ability to raise them. This is in contrast with, for example, the statute that tolls certain statutes of limitations for persons with mental disability, ORS 12.160(3). That statute provides that, if a person is suffering from a mental disability at the time a cause of action accrues, "the statute of limitation for commencing [an] action is tolled for so long as *the person* has a disabling mental condition that bars *the person from comprehending rights* that the person is otherwise bound to know." ORS 12.160(3) (emphases added). ORS 12.160(3) asks what "the person" could "comprehend," showing that the legislature knows how to draft a statute that places the focus on whether a particular claimant, for personal reasons, was capable of asserting a claim. It did not do that in ORS 138.510(3).

Context for understanding ORS 138.510(3) includes related provisions and this court's case law, and our cases have consistently applied a "reasonable person" standard. *See, e.g.*, *Bartz*, 314 Or at 359 (explaining that claims permissible under the escape clause involve "information that did not exist or was not reasonably available to a defendant" within the statute of limitation period, such as newly discovered evidence). In *Bartz*, the court declined to apply the escape clause to the petitioner's claim that his trial counsel had not advised him of a statutory defense, reasoning that the information needed to assert that claim—the statute providing for the defense, and trial counsel's failure to mention it—was available at the time of conviction. *Id.* at

359-60. The resolution of the case was guided by the presumption that "the ordinary means by which the legislature publishes and makes available its enactments are sufficient to inform persons of statutes that are relevant to them." *Id.* The degree to which the petitioner had the actual capacity to understand the information available to him did not figure into this court's analysis.

More recently, in *Gutale v. State of Oregon*, 364 Or 502, 435 P3d 728 (2019), this court adhered to the holding in *Bartz* but clarified that ORS 138.510(3) "requires assessing both whether the petitioner reasonably could have accessed the ground for relief and whether *a reasonable person in the petitioner's situation* would have thought to investigate the existence of that ground for relief." *Id.* at 512 (emphasis added). In *Gutale*, the petitioner alleged that his trial counsel failed to advise him of the immigration consequences of pleading guilty. *Id.* at 506. At the time of that alleged omission, the United States Supreme Court had held that trial counsel is required to give such advice. *Id.* at 505 (discussing *Padilla v. Kentucky*, 559 US 356, 130 S Ct 1473, 176 L Ed 2d 284 (2010)). Consequently, the information supporting a post-conviction claim for inadequate assistance of counsel was available at the time of the petitioner's conviction. This court determined, however, that the petitioner had had no reason to investigate whether his guilty plea would have "immigration consequences" prior to his detention by federal immigration authorities, which occurred after the statute of limitations in ORS 138.510(3) had expired. *Id.* at 514.

This court's reference in *Gutale* to "the petitioner's situation" could, at first glance, appear to call for an individualized inquiry into a petitioner's capacity to assert his or her rights. But the context of that statement in *Gutale* shows otherwise. In referring to the "petitioner's situation," the court was distinguishing the escape clause in ORS 138.510(3) from the similarly worded escape clause in ORS 138.550(3). The latter, the "successive petition" bar, precludes a petitioner from asserting a claim in a successive post-conviction petition that could have been raised in the original petition; only a claim "[which] could not reasonably have been raised" in the original petition may be asserted

in a successive petition. *Gutale*, 364 Or at 518. As this court explained in *Verduzco v. State of Oregon*, 357 Or 553, 563-64, 355 P3d 902 (2015), the untimely-petition escape clause in ORS 138.510(3) was copied from the successive-petition escape clause in ORS 138.550(3). *See id.* at 564 n 9 ("The *** legislature borrowed the escape clause from the bar against successive petitions and inserted it, without modification, in the bar against untimely petitions."). We have described the escape clause in ORS 138.550(3) as codifying "claim preclusion" principles, precluding a claim in a successive petition that a petitioner's counsel could reasonably have raised in the original petition. *Id.* at 565 (citing *Johnson v. Premo*, 355 Or 866, 874-75, 333 P3d 288 (2014), as explaining that ORS 138.550(3) "codifies claim preclusion principles").

Although the escape clause in ORS 138.510(3) was taken from ORS 138.550(3), the court in *Gutale* distinguished the two in an important respect. We reasoned that, although our case law has approached the successive-petition escape clause from the perspective of what a petitioner's *counsel* could reasonably have raised in the original petition, the untimely-petition escape clause applies in situations where a petitioner may not have been represented:

> "ORS 138.550(3) codifies claim preclusion principles: It addresses the question of whether a petitioner who already has litigated a petition for post-conviction relief may return to court and litigate a second time, and it provides that a petitioner may not do so where counsel reasonably could have raised the grounds at issue in that prior litigation. By contrast, when the bar on successive petitions does not apply, the inquiry under [ORS 138.510(3)] is whether a petitioner reasonably could have raised a ground for relief before any litigation has occurred. The focus of the reasonableness inquiry is therefore the petitioner, rather than an attorney representing the petitioner."

*Gutale*, 364 Or at 518-19 (footnotes and emphasis omitted).

In reaching that conclusion, the court in *Gutale* did not abandon the "reasonable person" test; it simply clarified that, for the untimely-petition escape clause, the focus must be on a reasonable *un*represented petitioner. That the court did not intend to move away from a "reasonable person"

standard is confirmed by the court's comparison of ORS 138.510(3) to a "discovery rule":

> "The resulting standard, therefore, requires assessing both whether the petitioner reasonably could have accessed the ground for relief and whether a reasonable person in the petitioner's situation would have thought to investigate the existence of that ground for relief. That standard is very similar to the standard for a discovery rule, which is used in other contexts. In negligence cases, for example, the statute of limitations does not begin until at least the earlier of two possible events: (1) the date of the plaintiff's actual discovery of injury; or (2) the date when a person exercising reasonable care should have discovered the injury, including learning facts that an inquiry would have disclosed."

*Id.* at 512 (internal quotation marks and emphasis omitted); *see also Doe v. Lake Oswego School District*, 353 Or 321, 332, 297 P3d 1287 (2013) ("The discovery rule applies an objective standard—how a reasonable person of ordinary prudence would have acted in the same or a similar situation."). In a case decided the same day as *Gutale*, this court reiterated the general understanding that, although individual characteristics such as mental disability typically allow for a statute of limitations to be *tolled*, the *commencement* of a statute of limitations, under a discovery rule, turns on an objective reasonableness standard. *Perez-Rodriguez v. State of Oregon*, 364 Or 489, 498, 435 P3d 746 (2019) ("[I]n applying statutes of limitations, courts frequently consider mental illness or intellectual capacity as part of a statutory or common-law tolling rule that is separate from the discovery rule's reasonableness inquiry. *See, e.g.*, ORS 12.160(3) (considering whether a 'person has a disabling mental condition' at the time a cause of action accrues).").

By analogizing ORS 138.510(3) to a "discovery rule" even as it held that a petitioner's "situation" must be considered, *Gutale* made clear that the escape-clause inquiry continues to be what a "reasonable person" could have timely asserted. The Court of Appeals below correctly understood that. *Ingle*, 315 Or App at 429 ("[T]he court in *Gutale* itself considered the petitioner's 'situation' only insofar as it considered what the petitioner had been told (or not told) about

immigration consequences when he entered his guilty plea and what a 'reasonable person' would have understood as a result. The court did not consider any personal characteristics of the petitioner." (Citation omitted.)).

The court in *Gutale* was careful to point out that its holding had limited implications and did not threaten to let the escape clause "exception" swallow the "rule":

> "[P]etitioners who were unaware of the immigration consequences of their convictions are a narrow class of petitioners. Allowing petitioner's claim in this case to fall within the escape clause does not run the risk of having the escape clause swallow the statute of limitations."

364 Or at 514.

In holding today that petitioner's mental illness may qualify him for relief under the escape clause, the majority departs from our precedent by displacing the objective "reasonable person" inquiry with an individualized one: whether petitioner could have asserted a claim in light of his mental impairments. Unlike the "narrow" class of petitioners that *Gutale* envisioned might benefit from its holding, the class of petitioners who will be affected by today's decision is potentially large. According to October 2022 data from the Department of Corrections, for example, 44 percent of adults in custody were identified as having at least a "moderate" need for mental health treatment. Nearly 30 percent have mental health needs that are "severe" or worse.[1] Although that figure does not necessarily mean that 30 percent of convicted felons will qualify for the escape clause under the court's new rule, it is a clue to the potential implications. And it reveals the unfortunate fact that severe mental illness is not an "extraordinary" circumstance when it comes to those convicted of crimes, as the legislature surely would have understood. The majority states that, even after today, "the amount of litigation will be limited by the fact that the bar for establishing that the escape clause applies is high." 371 Or at 444. Even if the bar for success remains high,

---

[1] *See* Oregon Department of Corrections, *Quick Facts*, October 2022, available at: https://www.oregon.gov/DOC/documents/agency-quick-facts.pdf (accessed Oct 9, 2023). The document states that 1,252 adults in custody, or 10.2 percent of the prison population, have the "Highest Treatment Need," while another 2,366, or 19.2 percent, have "Severe Mental Health Problems."

however—and that remains to be seen—it seems inevitable that today's decision will increase the amount of *litigation*, perhaps substantially, by claimants seeking relief under the escape clause based on their mental impairments.

Nor should one assume that the beneficiaries of today's decision will be limited to those with mental illness. The majority's rationale is that a person's mental illness should be sufficient to trigger the escape clause if it prevents that person from being able to access, process, and act upon information in a timely fashion. It is difficult to see why the same rationale should not apply to other personal characteristics that have the same effect. Post-conviction courts will either extend this rule to other mental and physical impairments, disabilities, and disorders or be faced with drawing elusive and unsatisfactory lines.

Without question, an escape clause so expansive in scope could be a reasonable policy choice. But it does not appear to be the policy choice that the legislature made. As already noted, the text of the statute, as interpreted consistently by this court up through *Gutale*, contemplates a "reasonable person" standard, not an inquiry into personal traits.

The majority's contextual reasons for concluding otherwise are not, in my view, persuasive. As already noted, ORS 138.510(3) was drawn from ORS 138.550(3), which this court has described as incorporating claim-preclusion principles. Therefore, as the state argues, both statutes are worded in a manner typical of discovery accrual rules, under which statutes of limitations are commenced based on a standard of objective reasonableness, as opposed to tolling provisions, which allow those statutes of limitations to be put on hold for reasons particular to the individual claimant (such as disability). The majority's response to that is that this court has already rejected the view that ORS 138.510(3) should necessarily be interpreted in lockstep with ORS 138.550(3). That point, while correct, does not help us understand how ORS 138.510(3) *ought* to be interpreted. The central question remains whether the legislature intended for that statute's escape clause to turn on an individualized inquiry rather than an objective reasonableness standard.

Rejecting the premise that ORS 138.510(3) should be interpreted similarly to ORS 138.550(3) can only show, at most, that the legislature *could* have intended for the former to be an individualized inquiry even though the latter is not. It does not establish what the legislature actually did intend.

The majority also points out that discovery accrual rules sometimes do account for personal characteristics—namely, a claimant's age. It is true that, in applying a "reasonable person" standard, this court has stated that a claimant's "status as a minor" is relevant. *Doe*, 353 Or at 333. But that is a very different proposition from the one the majority advances today. The distinction between what juveniles and adults should be expected to know is objective, pervasive throughout civil and criminal law, and can be applied without any fact-intensive investigation into a claimant's personal capabilities. One can differentiate between a "reasonable minor" and a "reasonable adult" and still be applying a "reasonable person" standard. The rule that the majority announces today, which makes the escape clause an individualized inquiry into a claimant's mental condition and abilities, severs any link to a "reasonable person" standard, and I do not understand the majority to contend otherwise.

The majority also suggests that legislators addressing the escape clause in 1989 and 1993 would have been aware of ORS 12.160(3), and therefore would have had in mind that mental illness is a basis for tolling in other contexts. But, as noted earlier, ORS 12.160(3), which is phrased in terms of what "a person" could "comprehend," makes it more significant that ORS 138.510(3) is not similarly phrased. In addition, ORS 12.160(4) caps the period of tolling under ORS 12.160(3) at a maximum of five years. Because the escape clause in ORS 138.510(3) has no temporal limitation, the majority's reasoning supposes that the legislature intended to provide a far more liberal allowance for mental disability in the post-conviction context than it has done for other civil claims. Given that the legislature in 1989 and 1993 was concerned primarily with *reducing* the number of post-conviction filings, it seems unlikely that the legislature simultaneously intended for the Post-Conviction Hearing Act to be uniquely generous in accounting for mental illness.

For the reasons that I have explained, I think the better interpretation of the text and context is that the legislature intended for the escape clause in ORS 138.510(3) to incorporate a "reasonable person" standard. The legislative history that the majority recounts is consistent with that understanding. The statute of limitations in ORS 138.510(3) was first added in 1989, when the legislature inserted a 120-day filing requirement, along with an escape clause to cover "extraordinary circumstances." Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2796, Apr 4, 1989, Tape 60, Side B (comments of Representative Kevin Mannix). During the 1989 deliberations, a representative of the Oregon Criminal Defense Lawyers Association informed legislators that the escape clause would be "severely limit[ed]." Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 284, June 12, 1989, Tape 123, Side A (statement of Ross Shepard describing escape clause as a "severely limit[ed]" exception). Shepard both confirmed that the escape clause would be confined to "extraordinary circumstances" and, notably, offered examples of what would qualify: newly discovered evidence, intervening changes to the law, or actions by third parties that actively interfered with a petitioner's ability to bring a claim. Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 284, June 12, 1989, Tape 122, Side A (describing a hypothetical situation involving late discovery of evidence of collusion between a prosecutor and a defense lawyer); Tape Recording, House Committee on Judiciary, Subcommittee on Civil and Judicial Administration, SB 284, June 12, 1989, Tape 123, Side A (referring to a situation where the statute that a defendant was convicted of violating is later declared unconstitutional).

In 1993, the legislature increased the statute of limitations period from 120 days to two years. As the majority explains, legislators were concerned that the 120-day period was too strict. Tape Recording, House Committee on Judiciary, Subcommittee on Crime and Corrections, HB 2352, Apr 7, 1993, Tape 70, Side A (Representative Kate Brown commenting, "My concern is the level of folks we're working with here, that sixty-seven percent of them don't

have a high school education and a lot of them aren't even able to read, and I just think two years is a reasonable statute of limitations under the folks we're working with."). The legislature did not alter the escape clause, which Representative Mannix described as "a savings clause for unconscionable situations where the system didn't work." *Id*.

Although it is evident from then-Representative Brown's comments that legislators had personal characteristics in mind in 1993 as a reason to sextuple *the statute of limitations*, any reference to personal characteristics is conspicuously absent from the legislative discussion of *the escape clause* in both 1989 and 1993. In those discussions, legislators contemplated the types of events that might qualify for relief under ORS 138.510(3) and identified only extrinsic facts like newly discovered evidence or changes to the law—matters that are consistent with a standard that asks what a "reasonable person" could have been expected to know. Considering the variety of attributes, conditions, disorders, and characteristics that might affect a person's ability to assimilate and act upon available information, it seems implausible that the legislature intended for such personal factors to suffice under an escape clause that was described variously as "severely limited," meant for narrow and "extraordinary" circumstances, and designed for "unconscionable" situations where "the system failed."

Because I am not persuaded that the legislature intended for personal characteristics to inform the question of when grounds for relief could "reasonably have been raised" for purposes of ORS 138.510(3), I respectfully dissent.

Balmer, S. J., joins in this dissenting opinion.